PARIENTE, J.
In this medical malpractice case, the key issue is whether the Second District Court of Appeal impermissibly reweighed the testimony presented by the plaintiffs’ expert witness as to whether the conduct of the hospital and emergency room doctor (the defendants) caused William Cox to suffer devastating damages as a result of a stroke. We conclude that by reweighing the evidence, the Second District’s decision in St. Joseph’s Hospital v. Cox, 14 So.3d 1124 (Fla. 2d DCA 2009), expressly and directly conflicts with this Court’s decisions in Wale v. Barnes, 278 So.2d 601 (Fla.1973), and Gooding v. University Hospital Building, Inc., 445 So.2d 1015 (Fla.1984). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
FACTS
At the age of sixty-nine, William Cox suffered a stroke with devastating consequences, leaving him with permanent paralysis and aphasia. Following a jury trial on his claim of medical malpractice, he received a jury verdict that awarded substantial damages to him and his wife. The key issue in this medical malpractice case was the legal sufficiency of the plaintiffs’ expert testimony regarding causation; that is, whether more likely than not, the administration of a tissue plasminogen activator (tPA), a drug that dissolves blood clots, would have prevented or mitigated the devastating consequences of the stroke.
The facts presented to the jury established that on the morning of January 19, 2001, Mr. Cox was at a friend’s car dealership. Mr. Cox initially appeared normal and was able to speak to a visitor. However, approximately fifteen to twenty minutes later, the same visitor found Mr. Cox incapacitated and unable to speak or walk, and he immediately called 911. Emergency personnel quickly arrived on scene to transport Mr. Cox to St. Joseph’s Hospital. The visitor informed the responding paramedics that Mr. Cox’s loss of ability occurred at some point during the fifteen- or *797 twenty-minute period before he had called 911.
Based on the information provided at the scene, the paramedics knew the approximate time of the onset of Mr. Cox’s stroke, but for unknown reasons, the emergency room staff at St. Joseph’s Hospital did not obtain this vital information and never attempted to acquire it. The failure of the defendants to obtain information regarding the time of onset of the stroke was the crux of the medical malpractice case because knowing the time of onset was critical to being able to treat Mr. Cox with tPA.
Specifically, Mr. Cox suffered an is-chemic stroke, which is caused by a blood clot. An ischemic stroke can be treated with the use of tPA, which dissolves blood clots. However, doctors have a short window of opportunity in which to administer this drug: no more than three hours after the onset of the stroke if administered intravenously and no more than six hours after onset if administered intra-arterially. Therefore, in order to consider using tPA, the treating doctor must know the time of onset of the stroke. Here, although Mr. Cox arrived at the hospital within the window for administering tPA and had undergone several tests, including a cranial computed tomography (CT scan), which was normal at the time of the admission to the hospital, the emergency room doctor never considered the use of tPA because he did not know the time of onset of the stroke.
Mr. Cox and his wife filed a medical malpractice action against St. Joseph’s Hospital, the emergency room doctor, and the doctor’s medical practice. Because the claim was against the emergency room doctor, pursuant to section 768.13(2)(b)(l), Florida Statutes (2000), the plaintiffs were required to show that the defendants acted with “reckless disregard” of Mr. Cox’s health in failing to obtain the information regarding the onset time of the stroke. That issue of whether the plaintiffs met that burden of proving medical malpractice is not before us; rather, the focus is on whether the defendants’ actions caused damages to be suffered by Cox.
During the trial, in order to prove causation, the plaintiffs presented the expert opinion testimony of Dr. Nancy Futrell. Dr. Futrell is a specialist in strokes who has founded several stroke centers around the country. Her background is extensive: she is certified in neurocineology (ultrasounds of the blood vessels in the neck and brain), MRI and CT reading, and she is board certified in vascular neurology. In fact, in terms of CT scans, she had previously worked as a CT scan images analysis contracts investigator, where she reviewed CT scans, digitized them, and determined the exact size of a stroke. In that job, she reviewed between 900 and 1100 CT scans. She has been treating stroke patients for over twelve years and has given tPA to patients approximately forty to fifty times during her practice.
Dr. Futrell testified that “to a high degree of medical probability” she believed that if Mr. Cox had received tPA, he “would have had a very good recovery and have minimal or no neurologic deficit.” St Joseph’s Hosp., 14 So.3d at 1126. Dr. Futrell asserted that she based her opinion on what she knew about Mr. Cox’s case, her own clinical experience, and the pertinent medical literature. During her testimony, Dr. Futrell explained why she believed that Mr. Cox was a good candidate for the use of tPA. First, based on his CT scan, his brain appeared to be much younger than his stated age and had normal fluid spaces. Normally when one ages, the brain shrinks, and the fluid spaces get larger, but in his case, the fluid spaces were not enlarged at all; there was no evidence of shrinking and therefore his brain “looks much younger than this man’s *798 stated age.” She saw no evidence of prior bleeding and no evidence that he had a prior stroke. Specifically she stated that “[i]f he had a bleed into his brain in the past, that bleed, if it had healed would leave a dark spot and I see no dark spots in here to suggest that he’s had any kind of a stroke or any kind of a bleed into his brain whatsoever.” She also saw no evidence of lesions or a subdural hematoma. She opined that because his brain was not shrinking yet, he was “not at high risk for another subdural hematoma.” Further, in response to the defense position that a prior subdural hematoma would have prevented the administration of tPA, she testified that even assuming he had a prior subdural hematoma, it was not significant enough to leave any shrinkage on the surface of the brain. Thus, if she had been the treating neurologist, she explained that she would not have been prevented from suggesting the use of tPA.
Second, in her opinion, the CT scan showed that Mr. Cox was an excellent candidate for tPA because irreversible damage had not yet started to occur at 'that point. Dr. Futrell recognized that a prior intracranial bleed is a contraindication to the use of tPA, but asserted that this does not mean that a doctor absolutely cannot give tPA to a patient based on this prior condition. She asserted that there are indications and contraindications, so doctors must balance those to obtain a risk-benefit profile, which requires good clinical judgment on the part of the doctor.
On cross-examination of Dr. Futrell, the defendants attempted to attack Dr. Fut-rell’s opinion based on their general contention that a 1995 clinical study of tPA, known as the “NINDS” study,[1] did not establish that there was a “more likely than not” chance of improvement from the effects of the stroke. In addition, the defendants contended that administration of the drug was contraindicated because of their claim that Cox had suffered a previous subdural hematoma.
Dr. Futrell disagreed with the defendants’ characterization of the NINDS study. She further questioned the accuracy of the reports indicating that Mr. Cox previously had suffered a subdural hema-toma because Mr. Cox’s current brain CT scan was normal and she did not see any signs of prior significant hemorrhages.
The defendants moved for a directed verdict on the issue of causation, which the trial court denied. The jury subsequently found in favor of the plaintiffs and awarded substantial damages. The defendants appealed to the Second District, which reversed the trial court on the basis that the plaintiffs failed to meet their burden of proving causation. St. Joseph’s Hasp., 14 So.3d at 1125. The district court reviewed the evidence before the trial court and held that the plaintiffs failed to meet this burden because the testimony of the expert witnesses was based only on speculation. In rejecting the plaintiffs’ argument that causation was sufficiently proven by the expert testimony in this case, the Second District held the cases relied upon by the plaintiffs were distinguishable because in those cases, the expert testimony was not constrained by statistical evidence revealing a success rate of less than fifty percent. Id. at 1128. The plaintiffs appealed, asserting that the decision of the Second District is in express and direct conflict with this Court’s decisions in Wale and Gooding.
*799 ANALYSIS
The issue before this Court is whether the district court reweighed legally sufficient evidence of causation from the plaintiffs’ expert witness that the administration of tPA, more likely than not, would have mitigated the devastating damages of Mr. Cox’s stroke. In this case, the Second District recognized that in Florida, a plaintiff seeking to establish a negligence action must demonstrate that the negligence “probably caused” the plaintiffs’ injury and that Dr. Futrell testified that “Mr. Cox probably would have had a good recovery from the stroke if he had received tPA therapy.” St. Joseph’s Hosp., 14 So.3d at 1127. However, after scrutinizing her testimony, the district court stated that it could “glean no facts that support her assertion that Mr. Cox would have had a fifty-one percent or greater chance of ben-efitting from tPA treatment.” Id.
In order to decide the matter before us, it is helpful to first review how this Court has addressed this issue in the two conflict cases. In Wale v. Barnes, 278 So.2d 601, 603 (Fla.1973), one of the conflict cases, the plaintiffs brought a medical malpractice case against two doctors, asserting that the doctors negligently used certain forceps during the delivery of a child that caused serious injuries to the child, who was later treated for bilateral subdural hematomas. During the trial, conflicting evidence showed that the injuries could have been caused by the type of forceps that the doctor chose or the nonnegligent act of the infant moving down the birth canal. Id. at 604. The district court in Wale misapplied prior decisions that held a defendant may be entitled to a directed verdict where the plaintiff did not eliminate possible nonnegligent causes because, in those cases, the plaintiff failed to introduce direct proof that the injury resulted from a definite negligent act. Id. This Court reversed, relying on the fact that the plaintiffs in Wale presented an expert who stated that the specific forceps that the defendant used were not the standard in this situation and opined that “within reasonable medical probability, the cause of the chronic subdural hematomas was the traumatic or injurious forceps delivery of this child in which the head was injured.” Id. at 605. Based on that testimony, this Court held the plaintiffs made a prima facie case as to causation. Id. Although there was conflicting evidence as to the cause of the injury, the Court held that this issue was a matter for the jury to resolve.
In contrast, in Gooding v. University Hospital Building, Inc., 445 So.2d 1015, 1017 (Fla.1984), the plaintiff brought a medical malpractice action, asserting that the hospital was negligent in failing to take adequate steps to diagnose and treat Mr. Gooding’s abdominal aneurysm before he bled out and went into cardiac arrest. In that case, while the plaintiffs’ expert witness testified that the inaction of the emergency room staff violated accepted medical standards, the expert did not testify that immediate diagnosis and surgery would have, more likely than not, enabled Mr. Gooding to survive. Id. After discussing Wale and the general standards that apply in negligence actions, this Court held that the defendant was entitled to a directed verdict because “the testimony established a no better than even chance for Mr. Gooding to survive, even had there been an immediate diagnosis of the aneurysm and emergency surgery.” Id. at 1018.
In turning to this case, the Second District correctly recognized that, in order to establish a negligence action, Florida follows the “more likely than not” standard in proving causation, i.e., that the negligence “probably caused” the plaintiffs injury. St. Joseph’s Hosp., 14 So.3d at 1127. Further, a plaintiff cannot sustain this burden of proof by relying on pure speculation — a rule that also applies *800 to medical experts. Id. In applying the standard to this case, however, the court held that even though Dr. Futrell testified that the negligence probably caused the injury, her testimony was pure speculation. Id. The Second District held that her testimony was legally insufficient to meet causation because during cross-examination, defense counsel discussed some opposing medical literature, including the NINDS study, which first established the efficacy of tPA therapy, and Dr. Futrell failed to respond to this cross-examination by comparing Mr. Cox to the patients in the NINDS study or testifying that she had enjoyed a greater success rate with tPA than how defense counsel had characterized the study. Id. at 1126-27. Specifically, the district court found Dr. Futrell’s testimony to be speculative based on the following reasoning:
Even assuming that Mr. Cox was an ideal candidate for the treatment — thus indulging for these purposes Dr. Fut-rell’s doubts that the treatment was contraindicated in Mr. Cox’s case because he previously suffered a subdural hema-toma — we find nothing in Dr. Futrell’s testimony or anywhere else in the evidence to suggest that Mr. Cox’s chances of benefiting from tPA therapy exceeded those of other patients. Dr. Futrell herself never testified that she had enjoyed a greater success rate with tPA than that documented in the NINDS study, i.e., thirty-one percent. She never compared any aspects of Mr. Cox’s physical condition to those of patients who had successful interventions in order to suggest that he, as opposed to sixty-nine percent of all patients, was predisposed to a positive outcome from tPA therapy. In short, Dr. Futrell’s opinion on causation was purely speculative.
Id. at 1127.
A review of the district court’s opinion and the record demonstrates that the district court impermissibly reweighed the evidence and substituted its own evaluation of the evidence in place of the jury. The district court’s opinion relied significantly upon the NINDS study and whether Dr. Futrell adequately addressed this conflicting evidence on cross-examination.
The record shows that after Dr. Futrell recognized that the NINDS study was the first study to show that the use of tPA could be effective for this treatment, defense counsel questioned Dr. Futrell as follows:
DEFENSE COUNSEL: The NINDS study indicated, did it not, Doctor, with its data that for every patient that made almost a full recovery or the kind of recovery you described to this jury as being more likely than not this is the thing that’s going to happen to Mr. Cox, for every patient that made that kind of recovery, the NINDS study said one of eight patients you gave the medication would make that kind of recovery; right, one of every eight?
DR. FUTRELL: That’s not exactly what, that’s a distortion of the NINDS study.
DEFENSE COUNSEL: You said that’s a distortion but what’s not a distortion is the study said that 20 percent of the people made that kind of recovery without any medication and that when you gave tPA, that number went up to 31 percent. That’s what it said, right?
DR. FUTRELL: It said that, yes.
DEFENSE COUNSEL: And you know if you do the mathematical calculation that that means you got to give this medication to eight people to get one that makes the kind of recovery you say Mr. Cox is going to get, isn’t that true?
DR. FUTRELL: No, that’s not true.
DEFENSE COUNSEL: Why isn’t it?
DR. FUTRELL: Well, first of all, the categories that Mr. Cox would go to *801 would be either of the two. The NINDS study had one category that was for complete recovery and the [study] had the next category that was for very good recovery or minimal neurological deficit and then there were other categories of moderate deficit, severe deficit, and death, and there are various ways you can add those numbers together. But the worst number in the NINDS that there was over a 30 percent, it was like 36% improvement from other problems and that was including all the people in [the] trial that had bad prognostic factors so the data have, unfortunately, been excluded in subsequent papers. What you’re quoting is a paper that later looked at the NINDS data and tried to say that tPA wasn’t that good. That number didn’t come from the NINDS trial at all.
(Emphasis added.)
A review of this testimony illustrates that Dr. Futrell did not agree that defense counsel had correctly characterized the statistics from the NINDS study. She explained that there were numerous categories in the NINDS study and that counsel was not using numbers from the NINDS study but rather from another paper that disagreed with whether the NINDS study demonstrated that tPA was as effective as it claimed to be. However, even though Dr. Futrell disagreed with this characterization of the study, the Second District did not accept this portion of her testimony and reweighed the evidence.
As our review of the caselaw illuminates, while a directed verdict is appropriate in cases where the plaintiff has failed to provide evidence that the negligent act more likely than not caused the injury, it is not appropriate in cases where there is conflicting evidence as to the causation or the likelihood of causation. If the plaintiff has presented evidence that could support a finding that the defendant more likely than not caused the injury, a directed verdict is improper. Here, the jury was presented with conflicting testimony as to the significance of statistics from the NINDS study — which is a matter for the jury, not a matter for the appellate court to resolve as a matter of law.
In reaching this holding, we agree that an expert cannot merely pronounce a conclusion that the negligent act more likely than not caused the injury. In this case, however, Dr. Futrell did not simply provide a summary conclusion without a factual basis. She conducted a full review of Mr. Cox’s medical records, provided a detailed analysis as to why she believed that Mr. Cox would have been an excellent candidate for tPA therapy, and based her testimony on her experience, the relevant medical literature, and her knowledge about the facts and records involved in this case, including an in-depth analysis of Mr. Cox’s CT scan. Defense counsel had the opportunity to cross-examine her as to the foundation of her opinion, which he did. However, during cross-examination, Dr. Futrell expounded on the factual foundation for her opinion regarding the NINDS study. In fact, Dr. Futrell explained during cross-examination that she disagreed with defense counsel’s characterization of the NINDS study and explained why she believed that defense counsel was inaccurate. It was within the jury’s province to evaluate Dr. Futrell’s credibility and weigh her testimony.[2] The Second District mis *802 applied our precedent by reweighing the evidence and rejecting Dr. Futrell’s explanation.
CONCLUSION
For the reasons explained above, we quash the decision of the Second District and remand this case to the district court for further proceedings consistent with this opinion. We do not address any of the remaining claims that were raised to the district court but were not a basis of its decision.[3] It is so ordered.
LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., dissents with an opinion.

. The "NINDS” study refers to the National Institute of Neurological Disorders and Stroke Recombinant Tissue Plasminogen Activator Stroke Study Group, the conclusions of which were reported in the December 14, 1995, issue of the New England Journal of Medicine. The study itself was not introduced into evidence.

. We expressly do not rely on the opinion letter of Dr. Eddy Berges, a treating neurologist, in determining the sufficiency of the evidence on causation. Dr. Berges first supported the view of Dr. Futrell on causation and then later recanted his testimony. See St. Joseph's Hosp., 14 So.3d at 1126. However, as addressed above, the plaintiffs adequately supported the element of causation through Dr. Futrell's testimony.

. In their answer briefs submitted to this Court, the defendants collectively raise seven additional issues. To the extent that these issues are not disposed of by our opinion but were properly raised on appeal before the Second District, the Second District may consider these additional issues on remand.