WARNER, J.
Hollywood Medical Center (“HMC”) appeals a final judgment in favor of Camillus Alfred as personal representative of the estate of his wife, Ursuline Alfred, based upon a jury verdict finding HMC liable for medical negligence in the death of Mrs. Alfred. HMC contends that the trial court erred in denying its motion for directed verdict, as Alfred failed to prove that any negligence on the part of the nursing staff of HMC affected the outcome, or that had the negligence not occurred, Mrs. Alfred more hkely than not would have survived. Instead, the evidence offered by the plaintiff showed that had the physician undertaken appropriate treatment at the time of the emergency admission, more likely than not Mrs. Alfred would have survived. We agree that no evidence supported causation and therefore reverse.
We summarize the facts presented in the plaintiffs case. Around 7:30 in the evening of May 18, 1996, 45-year-old Ursuline Alfred cried out “my head,” and her husband found her on the bathroom floor in a coma-like state. Alfred called emergency services which responded within minutes. The paramedics took her vital signs, which were near normal, and stabilized her, diagnosing her at the time as having a grand mal seizure. They transported her to HMC. Her oxygen level was well below normal, and they placed a breathing mask on her. Within a minute her level returned to normal. On the way, Mrs. Alfred became conscious enough to ask the paramedics to take off the mask. However, seconds before reaching the hospital she experienced another seizure, returning her to a postictal, or coma-like state. At 8:00 p.m. the paramedics recorded her vital signs at near normal levels. Their records show that she was delivered to the HMC emergency room at 8:08 p.m.
Plaintiff called Nurse Ackerly, who was on duty in the ER at the time of Alfred’s admission. Presented with the hospital records, Ackerly attempted to explain them, although fourteen years later she did not have specific recollection of the incident. The records revealed that the primary assessment of the patient was made at 8:16 p.m. The patient’s vital signs were recorded as a pulse rate in the low 40s, blood pressure rate of 49 over palp, which is very low, and a Glasgow coma score of 3, which is the lowest score which can be given. She had shallow breathing. Ackerly testified that this would make Mrs. Alfred a “level one” patient, meaning that she required the most intensive care, although “level two” was checked on the nursing notes by someone other than Ack-erly. She also testified that looking at the notes she identified as hers, they were intervening and treating Mrs. Alfred, not according to the level marked on her chart, but based on her vital signs. The emergency room physician, Dr. Schillinger, was at Mrs. Alfred’s bedside when Ackerly arrived, which was during the primary assessment. The emergency room staff also had the information from the paramedics *124 and their treatment of Mrs. Alfred en route to the hospital.
With this information, Dr. Schillinger ordered that Mrs. Alfred be given valium intravenously to prevent an additional seizure. At 8:20 she was administered Atropine, a potent heart medicine to jump start the heart. At 8:22 she was administered epinephrine, a vasoconstrictor also used to help the heart-pumping action. There was some evidence presented in plaintiffs case that Dr. Schillinger made one unsuccessful attempt to intubate Mrs. Alfred. She was then administered Anectine, a powerful paralytic, in order to permit intubation. Shortly thereafter, Mrs. Alfred went into full cardiac arrest and was pronounced dead at 8:40.
Dr. Bruce Charash, an expert in cardiology, testified for the plaintiff as to Mrs. Alfred’s survivability had proper treatment been given. He testified that her death was preventable had she been intubated and put on a respirator and treated immediately upon presentation to the emergency room around 8:15 or 8:16. When her vital signs were first recorded in the ER, Dr. Charash testified that it was apparent that she was “unraveling.” This required her immediate intubation to get more oxygen to her heart. Intubation takes only seconds. Without an autopsy, no definitive cause of death could be determined, but Dr. Charash thought that Mrs. Alfred had suffered a pulmonary embolism which could have been survivable given her age and the fact that she had already survived for nearly an hour from her first seizure.
Nurse Cindy Cook testified as an expert on nursing care. She maintained that recording Mrs. Alfred as a level two patient was far below the standard of care. In addition, the fact that the nurses did not take vital signs immediately upon Mrs. Alfred’s entry into the ER at 8:08, or apparently any time up until 8:15, was reckless, given her obviously compromised state. Moreover, between 8:15 and 8:30 no vital signs were recorded, from which Cook inferred that none were taken, which was also a severe breach of the standard of care. Cook also said the nurses should have questioned the physician when he ordered the administration of valium because of Mrs. Alfred’s low heart rate. Cook did not testify to causation.
Finally, Dr. Vernon Sichewski testified as an expert emergency room physician. He maintained that the emergency room physician should have intubated Mrs. Alfred immediately upon arrival in the ER. Moreover, the doctor should not have administered valium to her at 8:15 unless he intubated her immediately. And he testified that the physician should never have administered anectine. He did not opine as to the nursing care received by Mrs. Alfred.
The hospital moved for a directed verdict both as to its vicarious liability for Dr. Schillinger and for its nursing staff. As to the nursing staff, the hospital contended that the plaintiffs experts testified that Dr. Schillinger was negligent in failing to intubate Mrs. Alfred at 8:15, and had he done so, Mrs. Alfred more likely than not would have survived the incident. However, no evidence was presented that any conduct of the nursing staff caused or contributed to the failure of Dr. Schillinger to do so. The trial court denied the motion. HMC and Dr. Schillinger then presented their defense in which their experts testified that they acted within the standard of care. It is not necessary to this opinion to detail that evidence.
During jury deliberations, Dr. Schilling-er settled with the plaintiff. The jury returned a verdict finding both Dr. Schil-linger and the hospital negligent. The court entered a final judgment for Alfred, from which HMC now appeals.
*125 Although HMC raises several issues, we address only the denial of the motion for directed verdict, as that issue is dispositive of the case. The standard of review of an order denying a motion for directed verdict is de novo. Henry v. Hoelke, 82 So.3d 962, 965, 2011 WL 3477027 (Fla. 4th DCA 2011); Tarpon Springs Hosp. Found., Inc. v. Reth, 40 So.3d 823, 826 (Fla. 2d DCA 2010).
“To prevail in a medical malpractice case a plaintiff must establish the following: the standard of care owed by the defendant, the defendant’s breach of the standard of care, and that said breach proximately caused the damages claimed.” Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984). As to the nursing negligence, Alfred presented evidence of the standard of care through Nurse Cook that the nurses should have assessed Mrs. Alfred as a level one patient rather than a level two patient, should have recorded her vital signs earlier and more frequently, and should have questioned the doctor regarding the administration of valium when her vital signs were so compromised. Because they did not do any of these tasks, Nurse Cook testified that they breached the standard of care. What is missing here, as it was in Good-ing, is the third element, namely whether the breach of that duty proximately caused the damages claimed.
In Gooding, a patient presented at the hospital after experiencing abdominal pain. He had called his personal physician prior to his arrival at the emergency room, and the staff in the emergency room did not take a history or vital signs, believing that his personal physician was arriving to direct his care. Unfortunately, the patient had suffered an abdominal aneurism, went into cardiac arrest, and died. His wife sued the hospital for failing to take a history or administer any tests. Her expert testified that the hospital staffs inaction in failing to take a history and order tests fell below the standard of care, but he did not testify that immediate diagnosis and surgery more likely than not would have allowed the patient to survive. Because no such evidence was produced, the Florida Supreme Court ultimately held that the court should have directed a verdict because of the lack of evidence of causation. Specifically, the court held:
[A] plaintiff in a medical malpractice action must show more than a decreased chance of survival because of a defendant’s conduct. The plaintiff must show that the injury more likely than not resulted from the defendant’s negligence in order to establish a jury question on proximate cause. In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome.
Id. at 1020.
Applying Gooding to this case, it is apparent that Alfred failed to prove causation. He did not show that the breach of the standard of care by the nursing staff caused Mrs. Alfred’s death. What he showed was that the doctor’s failure to intubate Mrs. Alfred when her vital signs were crashing was negligent and more likely than not, had she been intubated, she would have survived. No one testified that the nurses had a duty to perform the intubation. No one testified that had the nurses checked the level one box on the nursing form or had they taken Mrs. Alfred’s vital signs immediately or more frequently, more likely than not she would have survived. In fact, Dr. Charash’s testimony as to the failure to intubate was dependent upon the crashing vital signs actually recorded at 8:15. Based upon those recorded vital signs, had the doctor acted more quickly in intubating Mrs. Alfred, she most likely would have sur *126 vived. Thus, while the evidence supported a conclusion that the physician’s failure to act affected the outcome, no one testified that the nurses’ failures to act affected Mrs. Alfred’s outcome. Without such testimony in a medical malpractice case, the defendant is entitled to a directed verdict.
Alfred cites the supreme court’s decision in Cox v. St. Josephs Hospital, 71 So.3d 795 (Fla.2011), for support, although it is completely distinguishable. In that medical malpractice case involving the failure to administer a blood-clot-dissolving drug to a stroke victim, the plaintiffs expert testified that had the drug been administered the patient more likely than not would have survived with minimal brain damage. The Second District reversed a jury verdict in favor of the plaintiff, concluding that the expert’s testimony was speculative and unsupported by the statistical evidence which showed a success rate of the drug of less than fifty percent. The supreme court quashed the district court’s decision, concluding that it had departed from the court’s precedent and had imper-missibly reweighed the expert’s testimony. While acknowledging that an expert’s opinion cannot be based on mere speculation, the court detailed how the expert’s testimony was based upon the expert’s thorough review of the patient’s medical history. Moreover, the analysis of the statistical evidence was a controverted issue at trial and thus an issue for the jury to decide.
Unlike Cox, in this case no evidence was presented that had the nurses monitored the patient’s vital signs earlier and more carefully Mrs. Alfred would have survived. Therefore, we are not reweighing any evidence because there was none on the causation issue with respect to the nurses’ negligence.
For the foregoing reasons, we reverse the final judgment and remand for entry of judgment in favor of the hospital.
MAY, C.J., and GROSS, J., concur.