# Supreme Court of Florida

_____

No. SC12-2416
_____

**SHANDALYN SANDERS, etc.,**
Petitioner,

vs.

**ERP OPERATING LIMITED PARTNERSHIP, etc.,**
Respondent.

[February 12, 2015]

QUINCE, J.

Shandalyn Sanders seeks review of the decision of the Fourth District Court

of Appeal in ERP Operating Ltd. Partnership v. Sanders, 96 So. 3d 929 (Fla. 4th

DCA 2012), on the ground that it expressly and directly conflicts with this Court's

decision in Cox v. St. Joseph's Hospital, 71 So. 3d 795 (Fla. 2011), and the Third

District's decision in Holley v. Mt. Zion Terrace Apartments, Inc., 382 So. 2d 98

(Fla. 3d DCA 1980),[1] regarding when a defendant is entitled to a directed verdict in

---

1. We acknowledge that following this Court's acceptance of jurisdiction based on an alleged conflict with Cox, Sanders alleged express and direct conflict with various Florida appellate court cases. However, we have determined that many of those cases are factually distinguishable, and do not warrant discussion.

a negligence action.  We have jurisdiction.  See art. V, § 3(b)(3), Fla. Const.  For the following reasons, we quash the decision of the Fourth District and remand for proceedings not inconsistent with this decision.

**FACTS AND PROCEDURAL HISTORY**

In late 2004, two young adults moved into an apartment complex marketed as a "gated community" with a gated front entrance.  Water surrounded approximately seventy percent of the complex, and a wall or fence surrounded the remainder.  The complex had a policy of providing reasonable lighting, locks, and peepholes.  The apartments contained alarm systems, which the residents could activate.

A year after they moved in, the victims were shot to death by unknown assailants inside their apartment.  Although there was no sign of forced entry, an engagement ring, cash, credit cards, and a computer modem were stolen from the apartment.

Evidence revealed that in the three years prior to the murders, there were two criminal incidents where the gate had been broken and perpetrators followed the residents onto the premises.  One of these incidents resulted in an armed robbery; the other resulted in an assault.  The entrance gate was broken for approximately two months prior to the murders.

The defendant, a national company owning approximately one hundred properties, owned the complex.  It had a manual providing that a notice to residents is recommended when "a significant crime" occurs on the property, especially a violent crime or forced entry burglary.  The manual recommended that such notice be provided to residents on the same day that management becomes aware of the incident, and provided a form for such notices.  No notices were sent to the residents of the twenty criminal incidents (including seven apartment burglaries, two robberies, and ten motor vehicle thefts) that occurred in the three years prior to the murders.

The plaintiff, as personal representative of the decedents' estate[s], filed a complaint against the defendant, alleging the defendant's negligence was a proximate cause of the deaths. The complaint alleged the defendant did not maintain the premises in a reasonably safe condition by failing to: (1) maintain the front gate; (2) have adequate security; (3) prevent dangerous persons from gaining access to the premises; and (4) protect and warn residents of dangerous conditions and criminal acts.

During discovery, the defendant deposed the boyfriend of one of the decedents. He testified that he was on the phone with the decedent prior to eleven o'clock in the evening. The call ended when the decedent told him that two identified people known to the decedent were at the door. When the boyfriend called back, no one answered.

The case proceeded to trial. The plaintiff moved in limine to exclude the boyfriend's statement about who was at the door on the night of the murders. The plaintiff argued that the statement constituted hearsay—in fact double hearsay—because the boyfriend did not testify at trial. The defendant argued that the statements were admissible as spontaneous statements. Alternatively, the statements were admissible because they did not fall within the definition of hearsay. The trial court ruled the statements inadmissible . . . .

. . . .

Later in the trial, the plaintiff offered the testimony of a criminology expert. He testified that most of the crimes at the complex in the three years prior to the murders were opportunistic in nature. Opportunistic crimes are those committed by perpetrators who look for easy targets. He further testified that such precursor crimes need to be monitored by the landowner because awareness is the cornerstone of crime prevention. He also noted that the defendant's training video informed its personnel that they needed to minimize such problems "through awareness."

The expert noted that the training video also addressed the importance of repairs to mechanical failures. Yet, the evidence demonstrated the gate had been inoperable for four months during the

- 3 -

year of these murders. The expert testified that it appeared the murders occurred in the course of another felony, such as a home invasion—an opportunistic crime. However, the expert agreed that there had never been a murder, shooting, or rape at the complex. The expert acknowledged there was no way of knowing precisely how the murders took place.

The defense expert, a security consultant, testified that the murders were not foreseeable. Of the twenty crimes which occurred on the premises in the three years leading up to the murders, none were violent crimes nor predicted homicide.

The defense expert explained that crimes such as stabbings, shootings, murders, or rapes constitute "predictors" of future violent crimes, but none of those had occurred at the location so there was no reason to foresee these murders. The defense expert opined that the security measures were "more than reasonable" and met or exceeded the industry standard of security for complexes in that location. He did not believe the gate was necessary given the low level of crime reported at that location. In conclusion, the defense expert testified:

> The [complex] provided [the decedents] with a secure locked environment, an apartment with one entrance, a steel door, and a dead bolt lock. There is no sign of forced entry. The materials that I received lead me to believe that the door was opened to the person that committed this particular crime.

The defendant moved for directed verdict, arguing the plaintiff had not established proximate cause or that the defendant had control over the apartment complex. The trial court denied the motion. The jury found the defendant forty percent comparatively negligent, and awarded damages of 4.5 million dollars apportioned to various survivors of the decedents.

The defendant moved for a new trial and a judgment notwithstanding the verdict, which the trial court denied.

ERP, 96 So. 3d at 930-32.

ERP appealed the judgment and orders to the Fourth District.  Id. at 932.

The Fourth District reversed the trial court's ruling on ERP's motion for directed

verdict, stating that "[w]ithout proof of how the assailants gained entry into the

apartment, [Sanders] simply could not prove causation."  Id. at 933.  Sanders seeks

review in this Court, alleging that the Fourth District's finding that she failed, as a

matter of law, to present evidence sufficient to create a factual issue regarding

causation conflicts with case law of this Court and other Florida district courts.

## THIS CASE

This Court accepted jurisdiction in this case to determine whether the Fourth

District erred in reversing the jury verdict and finding that Sanders did not present

sufficient evidence to establish that ERP's breach of duty was the proximate cause

of the deaths of the decedents in this negligent security action, thereby warranting

a directed verdict for ERP.

## PROXIMATE CAUSATION AND DIRECTED VERDICT

Whether or not proximate causation exists is a question of fact, involving an

inquiry into whether the respondent's breach of duty foreseeably and substantially

contributed to the plaintiff's injuries.  See McCain v. Fla. Power Corp., 593 So. 2d

500, 502 (Fla. 1992).  This Court has made clear that plaintiffs alleging negligence

in Florida must meet "the more likely than not standard of causation" as Florida

courts "require proof that the negligence probably caused the plaintiff's injury."

Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984).

> [A plaintiff] must introduce evidence which affords a reasonable basis
> for the conclusion that it is more likely than not that the conduct of the
> defendant was a substantial factor in bringing about the result. A mere
> possibility of such causation is not enough; and when the matter
> remains one of pure speculation or conjecture, or the probabilities are
> at best evenly balanced, it becomes the duty of the court to direct a
> verdict for the defendant.

Id. (quoting Prosser, Law of Torts § 41 (4th ed. 1971)).

In order for a court to remove the case from the trier of fact and grant a directed verdict, there must only be one reasonable inference from the plaintiff's evidence. See Owens v. Publix Supermarkets, Inc., 802 So. 2d 315, 322 (Fla. 2001). Where the jury only has to draw one inference from direct evidence to reach a decision regarding the defendant's negligence, the jury is entitled "to make the ultimate factual determination" regarding whether the defendant's breach was the proximate cause of the harm suffered. Id. at 329. Thus, if the jury is forced to stack inferences to find that the plaintiff presented a prima facie case of the defendant's negligence, then a directed verdict is warranted. An appellate court reviewing the grant of a directed verdict must view the evidence and all inferences of fact in the light most favorable to the non-moving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the non-moving party. Id.

THE FOURTH DISTRICT'S DECISION

ERP argued to the Fourth District that the trial court erred in denying its motion for directed verdict because Sanders failed to establish proximate cause for the deaths, based on the plaintiff's inability to explain how the assailants gained entry into the apartment. ERP, 96 So. 3d at 932. ERP also argued that the murders were not reasonably foreseeable in light of the relatively small number of property crimes that occurred on the premises in the three years prior to the murders. Id. Sanders responded that the murders were reasonably foreseeable and that the proof of gaps in security established the requisite causation. Id. The Fourth District determined that its previous decision in Brown v. Motel 6 Operating, L.P., Ltd., 989 So. 2d 658 (Fla. 4th DCA 2008), rev. denied, 1 So. 3d 171 (Fla. 2009), "dictate[d] the outcome of this case and reverse[d] the judgment." Id. at 930.

In Brown, the decedent was murdered in his hotel room and his estate filed a wrongful death action against the motel, alleging that it should have taken greater security precautions in light of past criminal activity. Brown, 989 So. 2d at 658. The motel in Brown was described as "an open type, with room access through outside stairways and balconies." Id. at 659. There were two security cameras on the premises, one at the front door and one at the front desk. Id. There was a security guard on duty every day from 9:00 p.m. to 5:00 a.m. Id. There had been a number of incidents reported to the sheriff during the two-year period preceding

this incident, but none were homicides; once, a guest was robbed after opening the door to an unknown person during the night. Id. The Fourth District decided that a jury could find that the motel breached its duty to provide adequate security. Id. The problem with the plaintiff's evidence, according to the Fourth District, was that it did not demonstrate that the injury resulted from the breach of duty. Id.

> <u>Plaintiff's expert on security acknowledged that there was no</u> <u>evidence as to how the person or persons who killed the decedent</u> <u>entered the room</u>. <u>There was no evidence of a forced entry to the</u> <u>decedent's room</u>, nor any evidence as to any activity other than the shooting. The door had a steel frame, an electronic door lock that would automatically close, and a peep hole. The expert agreed that the door met minimum standards for protecting access to the room, and that the decedent could have been shot by someone he knew and had allowed into the room.
>
> Plaintiff's expert based his opinion that security was lax on five police reports made during the previous two-year period: 1) a burglary to a room in which property was taken without force; 2) a sale of crack cocaine set up by a police informant; 3) an officer observing a person in a car with nine baggies of marijuana; 4) an armed robbery after a guest opened the door in response to a knock; and 5) an ex-employee jumping over the front desk in order to gain access to the area where the room keys were kept.

Id. (emphasis added). The trial judge granted summary judgment in favor of the motel and the Fourth District affirmed, finding that summary judgment was proper "[b]ecause there was no evidence of a forced entry, nor any evidence that the shooting could have been prevented with greater security." Id. at 658-59.

In comparing Brown to this case, the Fourth District stated: "The victims were murdered inside their apartment. There was no sign of a forced entry.

[Sanders'] expert acknowledged that it was unknown what happened on the night of the murders. Without proof of how the assailants gained entry into the apartment, [Sanders] simply could not prove causation." ERP, 96 So. 3d at 933. This finding led the Fourth District to reverse the trial court's judgment on the jury's verdict and its ruling on ERP's motion for directed verdict. Id.

## ALLEGED CONFLICT CASES

Sanders alleges that the Fourth District's decision conflicts with this Court's decision in Cox. In that case, William Cox and his wife sued the hospital that treated him after a stroke, claiming that the conduct of the emergency room staff caused him to suffer devastating damages. Id. at 796. The key issue was "whether more likely than not, the administration of a tissue plasminogen activator (tPA), a drug that dissolves blood clots, would have prevented or mitigated the devastating consequences of the stroke." Id. The plaintiffs' expert and the defense expert specifically disagreed regarding whether a 1995 clinical study of tPA established that there was a "more likely than not" chance of improvement from the effects of the stroke. Id. at 798. The trial court denied the defendant's motion for directed verdict, and the jury awarded substantial damages to the plaintiffs. Id.

On appeal, the Second District reversed the jury award, determining that the plaintiffs failed to meet their burden of proving causation "because the testimony of the expert witnesses was based only on speculation." Id. "[T]he Second

District held the cases relied upon by the plaintiffs were distinguishable because in those cases, the expert testimony was not constrained by statistical evidence revealing a success rate of less than fifty percent." Id. After accepting review based on express and direct conflict of decisions, this Court concluded that the Second District reweighed evidence regarding the cause of the plaintiff's injuries, thereby conflicting with prior decisions of this Court. Id. at 796. This Court acknowledged that the rule that "a plaintiff cannot sustain this burden of proof by relying on pure speculation . . . also applies to medical experts." Id. at 799-800. However, this Court determined that the plaintiffs' medical expert

> did not simply provide a summary conclusion without a factual basis. She conducted a full review of Mr. Cox's medical records, provided a detailed analysis as to why she believed that Mr. Cox would have been an excellent candidate for tPA therapy, and based her testimony on her experience, the relevant medical literature, and her knowledge about the facts and records involved in this case, including an in-depth analysis of Mr. Cox's CT scan. Defense counsel had the opportunity to cross-examine her as to the foundation of her opinion, which he did. However, during cross-examination, Dr. Futrell expounded on the factual foundation for her opinion regarding the NINDS study. In fact, Dr. Futrell explained during cross-examination that she disagreed with defense counsel's characterization of the NINDS study and explained why she believed that defense counsel was inaccurate.

Id. at 801 (footnote omitted). This Court concluded that "[i]t was within the jury's province to evaluate Dr. Futrell's credibility and weigh her testimony [and] [t]he Second District misapplied our precedent by reweighing the evidence and rejecting Dr. Futrell's explanation." Id. at 801-02.

- 10 -

Sanders also alleges that the Fourth District's decision conflicts with Holley. In that case, the decedent was raped and murdered inside her apartment, while she was a tenant in the defendant's apartment complex. Id. at 99. The "intruder, thought to have been a co-tenant . . . apparently gained access into [the] second story apartment through a window which fronted onto a common outside walkway." Id. The decedent's estate brought an action against the apartment complex alleging "negligent failure to provide reasonable security measures in the building's common areas." Id. After the trial judge entered summary judgment for the apartment complex, the plaintiff appealed to the Third District Court of Appeal. Id.

The district court in Holley determined the record indicated that the landlord had "recognized the dangerous nature of its premises in at least two ways": (a) by not accepting cash rental payments, and (b) by previously hiring uniformed armed guards to patrol and protect the complex and charging each tenant an additional five dollars a month for this service, a practice that had been abandoned by the time the decedent was killed. Id. The district court held that since "[t]he basis of the plaintiff's case is the almost indisputed fact that the intruder could have entered the apartment only through the common walkway adjacent to the decedent's window . . . it was for the jury to determine whether the defendant's alleged breach of duty as to the areas outside the apartment was a legal cause of what happened

- 11 -

inside." Id. at 101. As to the apartment complex's argument that because the assailant was probably a co-tenant, reasonable security measures would not have prevented the tragedy, the Third District found that the apartment complex did not affirmatively demonstrate that the security measures would not have deterred the assailant, or that the security officers would not have seen and stopped the assailant from entering the apartment. Id. at 101-02.

Although not raised by the parties, even more recently than Cox, this Court has addressed the issue regarding when a district court may properly reverse a jury verdict and hold that a defendant's motion for directed verdict should have been granted. In Friedrich v. Fetterman & Associates, P.A., 137 So. 3d 362 (Fla. 2013), the plaintiff was injured when the chair he sat on, inside of the defendant's law office, collapsed. Id. at 363. The plaintiff's expert and the defendant's expert disagreed as to whether the defendant "should have or could have discovered the defect of the chair upon reasonable inspection." Id. at 366. The defendant moved for a directed verdict at various points during the trial, claiming that the plaintiff had not established duty or causation. Id. at 364. The trial court denied the motions and ultimately issued a final judgment against the defendant, in accordance with the jury verdict. Id. The defendant appealed. See Fetterman & Assocs., P.A. v. Friedrich, 69 So. 3d 965 (Fla. 4th DCA 2011). The district court reversed the trial court's decision and remanded the case for entry of a directed

- 12 -

verdict in favor of the defendant.  Id. at 968.  Based on the plaintiff's expert's contradictory statements regarding when the dangerous condition of the chair could have been revealed, the district court determined that *"the jury had no basis from which to conclude that Fetterman would have discovered the defect in the chair,"* which the district court determined to be "an indispensable factor in determining liability."  Id.

After accepting the plaintiff's petition for review, this Court reiterated the standard for granting a directed verdict:

> In Florida, "[a]n appellate court ... must view the evidence and all inferences of fact in the light most favorable to the nonmoving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party." Owens, 802 So. 2d at 329.  A defendant is entitled to a directed verdict when "the plaintiff has failed to provide evidence that the negligent act more likely than not caused the injury," but a directed verdict is improper "[i]f the plaintiff has presented evidence that could support a finding that the defendant more likely than not caused the injury." Cox, 71 So. 3d at 801 (emphasis in original).  A directed verdict "is not appropriate in cases where there is conflicting evidence as to the causation or the likelihood of causation." Id.  When determining whether a directed verdict is appropriate, the reviewing court may not reweigh the evidence or substitute its judgment concerning credibility of the witnesses for that of the trier of fact. Id. at 801 ("It was within the jury's province to evaluate [the witness's] credibility and weigh her testimony.").

Friedrich, 137 So. 3d at 365.  This Court determined that the district court impermissibly reweighed the testimony of the expert witnesses during trial and quashed the district court's decision.

- 13 -

## PLAINTIFF'S PRIMA FACIE CASE OF DEFENDANT'S LIABILITY

The Fourth District erred in directing a verdict for ERP. The decedents lived on the property for approximately nine months before they were murdered. At trial, the jury heard testimony regarding the criminal activity that occurred on the premises within the three-year period preceding the decedents' deaths. The evidence indicated twenty incidents on the premises of the apartment complex in that time: one armed robbery of a female victim who was robbed at gunpoint while walking from her car to her apartment; one strong-armed robbery of a pizza delivery man (where three supposed non-tenants exited a car and stole pizza and money from the delivery man, without a weapon); one domestic violence forced entry (where an ex-boyfriend confronted an ex-girlfriend in the common area and forced her to unlock the door to her apartment); nine car thefts; one attempted car theft; one criminal mischief incident involving teenagers who damaged the complex's property; one burglary of a dwelling (which may or may not have been occupied); and five burglaries (four involving unoccupied dwellings and one involving a dispute between tenants where one broke into the other's apartment to gain possession of a phone).

Sanders' expert witness, Dr. George Kirkham, testified regarding the five crimes that occurred on the property during the time that the victims lived there, one of those crimes being the burglary of an unoccupied apartment, and the others

being attempted and completed car thefts. Kirkham admitted on cross-examination that there were no violent crimes on the property in the four months preceding this event, when the gate was inoperable. He explained, however, that of the twenty crimes that occurred on the property within the previous three-year period, two were violent crimes, i.e. the robbery of a pizza man and the robbery of a female tenant, at gunpoint. In the case of the female tenant who was robbed, she believed that a car had followed her into the complex but could not say with certainty whether the assailant came from that particular car. Neither victims of the robberies were physically injured.

Defense counsel implied that Dr. Kirkham's theory that the female victim may have been accosted by someone in the parking lot while getting out of her Mercedes-Benz was pure speculation. However, based on the history of car thefts in the complex that the residents were not notified about, the robbery of the pizza man by supposed unauthorized non-residents, the robbery of a different female tenant in the same manner approximately one year prior and the fact that on the night of the incident, the gate was not serving its purpose to limit access only to people authorized to be on the premises, this theory does not appear to be pure speculation, but a reasoned presumption based on the evidence. Whether or not it was foreseeable that the residents were in danger of harm because of criminals being allowed on the premises and that ERP's failure to limit the unauthorized

access caused the deaths of the decedents was an issue of fact for the jury to decide.

Similar to the Third District's decision in Holley, it appears that Sanders raised a reasonable inference that the landlord's breach on the outside of the apartment, the inoperable gate, may have contributed to what happened on the inside of the apartment. 382 So. 2d at 101. Even considering ERP's argument, and the Fourth District's apparent conclusion, that the decedents opened the door for their assailants, this is something which should properly be considered by a jury in a comparative negligence analysis and is not a basis for a directed verdict. See generally Green Cos. v. Divincenzo, 432 So. 2d 86 (Fla. 3d DCA 1983).

Sanders' evidence created a question of fact as to whether ERP more likely than not caused the decedents' deaths. Sanders' expert testified that the majority of the crimes that happened at the apartment complex were opportunistic crimes, including an armed robbery initiated when a resident was accosted in the parking lot of the complex.

The fact that the apartment complex in this case had an inoperable security gate distinguishes this case from Brown, where the motel was described as "an open type, with room access through outside stairways and balconies." 989 So. 2d at 659. The gate in this case was purposed to limit access to the premises only to those authorized to be on the grounds. A reasonable jury could have determined

that ERP's failure to maintain the security gate and failure to have the courtesy officer visible probably allowed the assailant(s) to get to the decedents' door more easily without being detected, which may not have been a consideration in <u>Brown</u>, where the motel only had two security cameras to observe what was happening on the premises, but not necessarily to limit the access to the resident's door. Therefore, the lack of forced entry in both cases is not dispositive of the causation issue.

## CONCLUSION

Because Sanders presented evidence that could support a finding that ERP more likely than not substantially contributed to the deaths in this case, we quash the Fourth District's decision granting a directed verdict to the defendant and remand for further proceedings consistent with this decision.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and PERRY, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., dissenting.

I would discharge this case because the decision of the Fourth District in <u>ERP Operating Ltd. Partnership v. Sanders</u>, 96 So. 3d 929 (Fla. 4th DCA 2012), does not expressly and directly conflict with this Court's decision in <u>Cox v. St.</u>

Joseph's Hospital, 71 So. 3d 795 (Fla. 2011), or the Third District's decision in Holley v. Mt. Zion Terrace Apartments, Inc., 382 So. 2d 98 (Fla. 3d DCA 1980).

ERP is entirely consistent with Cox as both cases applied the same rule of law and only reached different conclusions due to the differing circumstances of the two cases. Specifically, in Cox, 71 So. 3d at 801-02, this Court disapproved of the district court rejecting an expert's explanation of why the negligent act probably caused the injury. This Court in Cox explained that "a directed verdict is appropriate in cases where the plaintiff has failed to provide evidence that the negligent act more likely than not caused the injury," although it is inappropriate "in cases where there is conflicting evidence as to the causation or the likelihood of causation." Id. at 801. However, as opposed to Cox, where this Court held that a directed verdict was improper, Sanders did not present conflicting expert testimony that the apartment complex's negligence caused the injuries in this case. Instead, Sanders' expert testified only that the crime appeared to be opportunistic in nature and that there was no way to know how the murders occurred. ERP, 96 So. 3d at 931-32.

The majority opinion also states that ERP conflicts with Holley, a case the petitioner did not discuss during jurisdictional briefing and a case the majority admits this Court did not base its jurisdiction upon when granting review. See majority op. at 1 n.1. However, even if it were appropriate to base our conflict

jurisdiction on such a case, <u>Holley</u> is factually distinguishable. As the Fourth District explained, in <u>Holley</u> (unlike in <u>ERP</u>), "the complex had been plagued with violent crime, and evidence established that an intruder entered the apartment through a second story window facing a common walkway." <u>ERP</u>, 96 So. 3d at 933 n.2.

Accordingly, because this Court does not have conflict jurisdiction in this case, I respectfully dissent.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal - Direct Conflict of Decisions

Fourth District - Case No. 4D09-5188

(Broward County)

Jeffery Lee Allen of the Law Offices of Jeffery Allen, Miami, Florida; Thaddeus L. Hamilton of Thaddeus Hamilton, P.A., Plantation, Florida; and Philip Mead Burlington of Burlington & Rockenbach, P.A., West Palm Beach, Florida,

for Petitioner

Richard A. Sherman, Sr., and James Warren Sherman of the Law Offices of Richard A. Sherman, P.A., Fort Lauderdale, Florida; and Joel Richard Wolpe of Wolpe, Leibowitz, Alvarez & Fernandez, L.L.P., Miami, Florida,

for Respondent