DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SPEEDWAY, LLC,**
Appellant,

v.

**GLORIA CEVALLOS,**
Appellee.

No. 4D20-1120

[December 15, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Lisa S. Small, Judge; L.T. Case No. 50-2016-CA-002299-XXXX-MB.

Michael K. McCaffrey and Andrew S. Connell, Jr. of Litchfield Cavo LLP, Fort Lauderdale, for appellant.

Blair M. Fazzio and Berkin Aslan of Kanner & Pintaluga, P.A., Boca Raton, for appellee.

WARNER, J.

Speedway LLC appeals a final judgment which awarded appellee Gloria Cevallos substantial damages related to a slip and fall at a Speedway gas station. It contends that the court erred in denying its motion for directed verdict, as appellee failed to prove that Speedway had constructive knowledge of a dangerous condition. Because appellee failed to offer evidence of a dangerous condition or that any condition existed for a period of time sufficient to establish constructive notice of it, the trial court erred in denying the motion for directed verdict. We reverse.

Appellee Cevallos pulled into a gas pump at a Speedway gas station and went inside the station to pay for the gas. As she was walking back to her car, another car ahead of her car exited out of the station. In a surveillance video, the exiting car left behind a puddle of liquid. Cevallos began to pump her gas. While waiting for the gas to finish, she moved toward the trash can nearby to throw something away. She took a few steps around the pump and slipped on a liquid substance of oil and gas left by the car that had vacated the premises 111 seconds earlier. Cevallos fell to the

ground in pain. She testified that she had not seen the puddle at any time prior to her accident. Her clothes were soaked with gasoline from her fall. The fall resulted in multiple fractures and surgery to repair the damage.

Cevallos tried the case on the theory that "buildup" occurred on the concrete which was caused by inadequate maintenance by Speedway. Counsel first introduced the term at trial in examining the maintenance technician. Counsel explained that "buildup" was present when "pristine poured concrete that's poured for the first time . . . [is] all a nice uniform color. And as that concrete is used for whatever purpose, be it a sidewalk, driveway, gas station, that concrete discolors over time and there's a buildup that occurs on that concrete, whether it's from spills, oil, tires, things like that." The maintenance technician testified that the area around the gas pumps was a "roughly smooth" concrete which was porous and would absorb liquids. He testified that he was not a concrete expert, nor was he qualified to determine whether there was buildup on concrete.

According to the maintenance technician, Speedway did not have employees with the specific responsibility of inspecting floor surfaces but that all employees were trained to look out for hazards. When a maintenance tech observes a safety issue, the tech brings it up and discusses it at a weekly conference call with Speedway technicians and their supervisors. In one such call, a technician noted that he observed buildup around a gas pump and that techs should be on the lookout for it. A supervisor agreed, but no additional protocols were issued to address the issue.

On cross-examination, the maintenance technician agreed that the buildup he referred to typically involved diesel fuel and pumps, which were not the type of gas pumps where Cevallos fell. He testified that he was not aware of any ongoing gasoline spills at the subject Speedway store during his five years as the store's maintenance technician, which encompassed the date of Cevallos' accident.

Speedway trained its employees on cleaning, but the station manager did not remember specific training on concrete maintenance. She did not receive training specifically on how to clean up buildups, as maintenance technicians would be responsible for that. Speedway safety protocols included inspection of the pumps every two hours. Employees were trained to inspect the outside pump area, including the floor surfaces during these inspections. The Speedway operations manual specified that "[l]ot should be checked throughout the day for spills – i.e., oil, motor fuel, etc. When spills are discovered, proper clean up steps are to be followed." It also required the parking lot and sidewalks to be swept daily and for

employees to report any large cracks or potholes.  Upon opening the store, employees should "[i]nspect the lot; clean up any spills, debris, or litter."  Under "general safety guidelines" in the manual, employees were directed to "[c]lean up spills immediately" and to "[u]se oil dry for oil or fuel spills on the driveway.  Immediately clean up sills, breakage or trash."  The manual did not include anything about "buildup" or how to inspect the flooring around the gas pumps.

The manager of the station and the district manager both testified that gasoline spills were not a frequent occurrence at the subject store.  Similarly, the maintenance technician also testified that in the five years he was assigned to the store, he was not aware of any issues with ongoing gasoline spills.  Usually, such spills were the result of customer error in pumping gas.  The manager also testified that she was unaware of any buildups around the gas pumps, aside from the diesel pumps, during her time as manager, and those did not involve the floor surface.

The district manager testified that the area was pressure cleaned monthly and had been cleaned about three weeks prior to the accident.  The purpose of the pressure cleaning was to make the area more attractive by removing various stains.

On the date of the incident, the station manager and two other employees shared all duties for the store, including checking for hazards.  The manager explained that their duties regarding the outside included to check the gas pumps daily, make sure all areas were clean, sweep the concrete and dry up any gasoline spills with sand.  If gas were to leave a stain, they would use a multipurpose cleaner she called "Re-Crete."

A surveillance video showed an employee inspecting the area approximately thirty minutes before Cevallos' fall.  The employee was shown walking outside with a broom and dust pan and walking from one side of the pumps to the other.  There was no spill in front of the pump where Cevallos later fell.  The employee's entire inspection took about two minutes.

Just after Cevallos' fall, the general manager inspected the area and took pictures which were admitted into evidence.  The general manager was asked to review them and testified that she did not see any stains in the photographs but pointed out that gasoline had been spilled in some of the photos.  The photos consisted of pictures of the area where Cevallos fell.  They showed a floor with multiple brown spots on it.  Later, after reviewing the video, she admitted that the concrete floor showed stains on it.

3

Out of turn, Speedway called an expert witness who testified that there was no evidence of any "buildup" at the subject store. The expert testified that the concrete floor surface at the pump at the time of Cevallos' accident was "substantially similar" to the floor surface as it existed at the time of his personal inspection three years later, with the exception of a "puddle of gasoline." Based upon his expertise, the floor surface where Cevallos fell was "slip resistant" and an appropriate surface. Although he agreed that buildup is possible, he saw no evidence of it in this case, after reviewing the photos in evidence.

At the close of plaintiff's case, Speedway moved for a directed verdict, contending that Cevallos failed to present any evidence that Speedway had actual or constructive notice of a spill or dangerous condition. The puddle of gasoline in which Cevallos slipped had only been present for 111 seconds before the accident, and there was no evidence to support Cevallos' allegations of actual or constructive knowledge of buildup or that there was any buildup at all at the time of the fall. Cevallos responded that she slipped on the gas because of the poorly maintained poured-concrete that had buildup on it, as demonstrated by the photographs taken immediately after she fell which allegedly showed a buildup. The court granted the motion for directed verdict on all issues except constructive notice. After the court denied the renewed motion for directed verdict at the close of all the evidence, the case was submitted to the jury. The jury returned a verdict for Cevallos, and the court entered judgment on the verdict. Speedway then filed an appeal.

The standard of review of an order denying a motion for directed verdict is de novo. *Hollywood Med. Ctr., Inc. v. Alfred*, 82 So. 3d 122, 125 (Fla. 4th DCA 2012) (citations omitted). "A trial court should grant a motion for directed verdict when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ about the existence of a material fact and the movant is entitled to judgment as a matter of law." *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009) (citation omitted). "When an appellate court reviews the grant of a directed verdict, it must view the evidence and all inferences of fact in a light most favorable to the nonmoving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party." *Id.* (quoting *Frenz Enters., Inc. v. Port Everglades*, 746 So. 2d 498, 502 (Fla. 4th DCA 1999)).

Section 768.0755, Florida Statutes (2016), governs liability in premises cases involving transitory foreign substances in a business establishment, and provides:

(1) If a person slips and falls on a transitory foreign substance in a business establishment, the injured person must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Constructive knowledge may be proven by circumstantial evidence showing that:

(a) The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or

(b) The condition occurred with regularity and was therefore foreseeable.

§ 768.0755, Fla. Stat. (2016). The statute places the burden on the plaintiff to prove actual or constructive knowledge by the premises owner of the dangerous condition.

As indicated in section 768.0755, constructive notice may be inferred from either: (1) the amount of time a substance has been on the floor; or (2) the fact that the condition occurred with such frequency that the owner should have known of its existence. In the latter category, "evidence of recurring or ongoing problems that could have resulted from operational negligence or negligent maintenance becomes relevant to the issue of foreseeability of a dangerous condition." *Owens v. Publix Supermarkets, Inc.*, 802 So. 2d 315, 320 (Fla. 2001) (citations omitted).

Constructive knowledge in this case was not proved by the amount of time the substance had been on the floor, because the puddle was only on the concrete surface for 111 seconds before Cevallos fell. *See Walker v. Winn-Dixie Stores, Inc.*, 160 So. 3d 909, 912 (Fla. 1st DCA 2014) (water on floor for four minutes prior to fall "was insufficient to satisfy the statute's requirement that the alleged dangerous condition must exist 'for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition' before constructive knowledge of the condition can be imputed").

Instead, Cevallos tried to establish that the condition of buildup occurred with regularity and was foreseeable. Of course, that theory requires that she prove that buildup actually occurred at the time and location of her fall and that it contributed to her fall. She never proved that foundational fact. The manager testified that she saw no buildup, and the expert testified that he saw no evidence of buildup when

5

considering the photos of the concrete taken on the date of the fall. None of the witnesses testified that buildup was a problem, other than around diesel pumps. In arguing against a directed verdict, Cevallos' counsel relied solely on the photos of the concrete to establish the existence of buildup. The photos showed discoloration of the concrete, or brown spots. The photos did not reveal whether those spots were oil or dirt accumulated on the concrete surface, or, as the district manager testified, simply stains on the concrete. In other words, there was nothing to establish that there was buildup which would create a slippery condition on the concrete. The photos could show simple discoloration rather than buildup, as the fact witnesses testified.

Where photos are ambiguous, as the ones here, as to the condition and duration of the condition revealed, they do not support an inference of constructive notice. In *Hannewacker v. City of Jacksonville Beach*, 419 So. 2d 308, 311–12 (Fla. 1982), the court discussed the evidentiary value of photographs to support constructive notice of a dangerous condition:

> If the photograph portrays a condition that has some distinguishing feature which clearly shows that the defect has existed for a long period of time, it may afford the jury a basis to infer that a significant period of time has passed. **If the photograph is ambiguous on this point and what is shown makes it questionable whether a significant period has passed, the jury would necessarily be required to indulge in speculation to determine the duration of the condition**. **In such a case the photograph without live testimony is insufficient.** This is no different than if a witness testifies to the condition of a defect at the time of an accident and there are no distinguishing features or other testimony to indicate its duration. In such instance the trial judge is entitled to direct a verdict on the question of constructive notice.

*Id.* (footnote omitted) (emphasis added). In this case, what was shown in the photograph not only required speculation as to how long the condition existed, but it also required speculation on the part of the jury as to the very existence of the condition of buildup itself.

Even if the photographs did show buildup, Cevallos' theory of the case needed the jury to infer that Speedway failed to adequately train its employees on concrete maintenance and to maintain policies to protect its outdoor premises from "buildup." Based on this inference, it sought the jury to infer that Speedway allowed such buildup to occur, and that

6

buildup did occur, which resulted in Cevallos fall. Thus, she sought to build an inference upon an inference.

In negligence cases involving circumstantial evidence, "a fact may be established by circumstantial evidence as effectively and as conclusively as it may be proved by direct positive evidence." *Stanley v. Marceaux*, 991 So. 2d 938, 940 (Fla. 4th DCA 2008) (quoting *Nielsen v. City of Sarasota*, 117 So. 2d 731, 733 (Fla. 1960)). However, this rule is subject to the following limitation: "if a party to a civil action depends upon the inferences to be drawn from circumstantial evidence as proof of one fact, it cannot construct a further inference upon the initial inference in order to establish a further fact unless it can be found that the original, basic inference was established to the exclusion of all other reasonable inferences." *Id.* (quoting *Nielsen,* 117 So. 2d at 733).

"Where an inference is based upon circumstantial evidence in a civil case, it must be the only reasonable inference that can be formed from that evidence for the plaintiff to build further inferences upon it." *Broward Exec. Builders, Inc. v. Zota,* 192 So. 3d 534, 537 (Fla. 4th DCA 2016) (citation omitted). "The rule that an inference may not be stacked on another inference is designed to protect litigants from verdicts based upon conjecture and speculation." *Stanley*, 991 So. 2d at 940.

An example of this rule in action is found in *Tallahassee Medical Center, Inc. v. Kemp*, 324 So. 3d 14 (Fla. 1st DCA 2021), *reh'g denied* (Aug. 24, 2021). There, a hospital visitor sued a medical center for serious injuries she sustained in a slip and fall that occurred while she was walking past the nurses' station. Plaintiff alleged the center's negligence caused her injury because the floor was wet. Evidence established that no one saw a wet substance that plaintiff blamed for her fall. Plaintiff relied on the way she fell and the fact that her clothes were wet after the fall to establish that a liquid substance was on the floor. *Id.* at 15–16.

In reversing the denial of a directed verdict, the First District noted that the jury would have had to rely on improperly stacked inferences to find the medical center negligent. The court explained:

> This is not an instance where the main inference underlying the plaintiff's case—that plaintiff slipped on an employee-caused wet spot—can be established to the exclusion of other reasonable inferences. Indeed, it is just as plausible and reasonable to infer that no liquid was on the floor and that the wetness [plaintiff] perceived came from her own flip-flops and clothes after walking into the hospital out

7

of a rainstorm. Nor can additional inferences, that are questionable in their own right, be rightfully stacked here; speculations such as: that the bags, trays, and cart shown on the video contained liquids; that liquids leaked, spilled, or seeped onto the floor from one of these items due to employee negligence; and that hospital employees failed to wipe up the liquid on the floor in the busy hallway before [plaintiff] slipped, even though they were trained to look for and immediately wipe up liquids found on the floor. In fact, there is no evidence here that the bags, carts, and trays from the video carried any liquids. Nor is there evidence, even if the bags had carried wet stuff, that they leaked, seeped through, or otherwise deposited wet stuff on the floor. Nor does the evidence show that any of the carts or trays were mishandled and spilled liquids onto the floor. In fact, no substance was seen on the floor before [plaintiff's] fall.

*Id.* at 17.

Similarly, in this case, Cevallos invited the jury to infer that Speedway deliberately refrained from implementing a single policy regarding maintenance of the concrete at the fuel pumps and guidance to its store manager, and then asked the jury to stack upon that inference, the further inference that the lack of a policy resulted in unreasonably slippery concrete due to "buildup."

Although the evidence indicates that Speedway had no express policy or training specific to "concrete" or "buildups," the evidence indicated that it had training and policies for maintenance of the outside in general. The evidence showed that Speedway had training, operation manuals, and safety checklists. It also established that the concrete had been pressure cleaned seventeen days before the accident. Thus, although one could infer that Speedway refrained from properly training or maintaining its lot, one could also infer that Speedway's training and policies demonstrated an adequate operation of its maintenance responsibilities.

Whether the initial inference is that Cevallos slipped on buildup or whether Speedway did not have training policies for cleaning buildup off the concrete, neither was established to the exclusion of all other reasonable inferences. The jury was left to speculate as to the existence of the condition and Speedway's constructive knowledge. Because of this, the court erred in denying the motion for directed verdict.

Section 768.0755 requires the plaintiff to prove the premises owner's constructive knowledge of a dangerous condition which causes a slip and fall on a transitory substance. Cevallos' failure to prove the elements of the statute require reversal of the final judgment and entry of judgment for Speedway.

*Reversed and remanded for vacation of final judgment and entry of new final judgment.*

GERBER and LEVINE, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***