# Third District Court of Appeal

## State of Florida

Opinion filed July 26, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D22-206
Lower Tribunal No. 16-2102
_____

## Shoma Coral Gables, LLC, etc.,
Appellant,

vs.

## Gables Investment Holdings, LLC, etc., et al.,
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, William Thomas, Judge.

White & Case LLP, and Raoul G. Cantero, James N. Robinson and Zachary B. Dickens; Leto Law Firm, and Matthew P. Leto; Frank Silva, for appellant.

Burstyn Law PLLC, and Sean A. Burstyn; Crabtree & Auslander, and John G. Crabtree, Charles M. Auslander and Brian C. Tackenberg, for appellees.


Before HENDON, GORDO and BOKOR, JJ.

GORDO, J.

Shoma Coral Gables, LLC, ("Shoma") appeals an order granting Gables Investment Holdings, LLC ("CMC"), and Ugo Colombo's motion for directed verdict, vacating the jury's verdict in its entirety and dismissing the case with prejudice. We have jurisdiction. Fla. R. App. P. 9.030(b)(1)(A). Because we find the trial court erred in directing a verdict for CMC after Shoma established a direct claim under Delaware's Tooley test, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Deal

In 2013, Shoma contracted to purchase property next to The Collection car dealership in Coral Gables, Florida. Shoma subsequently entered into a business relationship with Ugo Colombo ("Colombo") and his company CHC. Shoma and CMC created and became equal members of Luxury Holdings, a new Delaware limited liability company governed by an operating agreement. Pursuant to the operating agreement, the business affairs of the company were to be carried out by the management committee consisting of two individuals, one appointed by CMC and one by Shoma. Shoma appointed its principal, Masoud Shojaee, and CMC appointed Colombo.

The operating agreement contained two relevant provisions—4.3 and 4.8. Section 4.3(a) states in part that "the written consent of the Management Committee [here, Shojaee and Colombo] shall be required in

2

order for a Manager, Member, or the [Joint Venture]" to undertake any of

major decisions, including:

> (iii) approval or modification of any Contract between (A) the Company and any Affiliate of any Member or Manager . . .(C) any broker or sales agency for the sale of the units in the Project . . ;
>
> (iv) the adoption of any significant modification to the scope of the plan for the development, operation, marketing and sale of the Property and/or the Project;
>
> (v) adoption of, or any modification to (if the modification provides for a reduction in projected revenues of more than three percent (3%)), the Project Budget;
>
> . . .
>
> (xvi) hiring or replacing the Company . . . lead real estate brokerage company . . . ; and
>
> . . .
>
> (xxi) taking any action which would make it impossible to carry on the ordinary business of the Company
>
> . . .
>
> (xliii) causing the voluntary dissolution and winding up, termination or liquidation of the Company;
>
> . . .

Section 4.8 of the operating agreement provides, in part:

> Except as contemplated by express provision of this Agreement, the Company shall not enter into any contract, obligation or other commitment to which an Affiliate of any Member is, or is to be, a party (an "Affiliate Transaction") without compliance with this Section 4.8. . . . The Member whose Affiliate is not a party or proposed party to the Affiliate Transaction in question (the 'Non-Affiliated Member') shall, notwithstanding anything to the contrary in this Agreement be entitled (i) to reasonably determine

whether the Company enters into such proposed Affiliate Transaction; and (ii) if the Company enters into such Affiliate Transaction to act exclusively for the Company in connection with . . . modifying, amending or terminating such Affiliate Transaction . . . . Such right of the Non-Affiliated Member to act exclusively for the Company with respect to any such Affiliate Transaction is generally intended to permit the Non-Affiliated Member to exercise any rights or remedies, including without limitation any right of termination of the Affiliate, without being prevented from doing so by the Affiliated Member . . . ."

## II.   Development and Disputes

The plan to develop the property into a mixed-use condominium proceeded.  A budget estimated the cost of building a basement garage at around $9 million.  One of CMC's affiliate companies staffed the project's sales office and handled potential buyers.

In July 2014, Colombo told Shojaee they should "stay on the high side" when pricing spaces. CMC's CFO prepared detailed cash-flow projections and budgets for the project, and from January to July 2015 used a $700 per square foot price for the ground-floor retail space.  Eventually, CMC's CFO circulated new cash-flow and budget projections indicating a new $500 per square foot price.

In September 2015, Colombo met with Shojaee on The Collection's behalf to discuss its purchase of the ground-floor retail and basement garage at the $500 per square foot price.  Shojaee rejected the offer stating the

4

lowered price was not in Luxury Holding's best interests and countered at $700 per square foot. The difference between Colombo's offer and Shojaee's counter was approximately $6 million.

Shoma and CMC did not reach an agreement and in October 2015, they entered a formal dispute resolution process as required by the operating agreement. A meeting was set but Colombo did not attend, and Shojaee sent an email rejecting The Collection's offer. During this time, Colombo unilaterally and without notice to Shoma or Shojaee instructed the sales associates to stop selling the project and shut down the sales office. Colombo also unilaterally ordered all marketing efforts stopped, ceased signing reservation forms and took down the sales website. At no point, did Colombo inform Shojaee he shut down the project. Shojaee was notified of the shut down by a text message from a salesperson.

### III. The Litigation

In 2016, Shoma filed a complaint directly against CMC and Colombo for: (1) breach of the operating agreement; (2) breach of the fiduciary duty of good faith; and (3) breach of the fiduciary duty of care, seeking damages which included lost profits.[1] CMC and Colombo filed a motion to dismiss the

---

[1] Shoma's complaint also raised claims against the Collection. As the Collection is not a party to this appeal, the claims against it are not addressed.

5

complaint, which was denied by the trial court. In its order denying the motion, however, the trial court noted its concern that it was "unclear from the relief sought whether Shoma seeks redress on its own behalf or also on behalf of CMC." Shoma subsequently filed a separate derivative action on Luxury Holdings' behalf asserting claims against CMC and Colombo for breach of the express contractual duty of good faith and the duty of care, which sought damages including lost profits. CMC and Colombo filed an answer and affirmative defenses in both cases.

*A. Narrowing of Shoma's Claims*

CMC and Colombo moved for summary judgment on Shoma's claim for lost profits in both actions in April 2018. In the direct action, the trial court granted the motion, finding Shoma's lost profits argument was too speculative. Shortly thereafter, CMC and Colombo filed a motion to stay the direct action and requested an immediate hearing contending that because the lost profits argument had been disposed of, there were no actual damages—which in turn meant there was no subject matter jurisdiction—because the upcoming sale of the subject property would cover any damage Shoma had suffered.

Shoma filed a response in opposition to the motion to stay, asserting that while the trial court had disposed of their lost profits claim, it was still

6

entitled to pursue its claim for reliance damages—namely, its out-of-pocket expenses, "which include[d] expenditures related to the construction of a sales office, development of the project, and marketing costs."  Shoma argued that based on CMC and Colombo's misconduct, it was entitled to recover those "expenditures made in preparation for performance or in part performance."  The trial court held a hearing and ultimately denied the motion to stay.

Around this same time, CMC and Colombo moved for judgment on the pleadings on all claims in both actions, which the trial court granted.  This Court affirmed in part and reversed in part, finding "Shoma could not state claims for breach of fiduciary duties as a matter of law" either directly or derivatively, but that Shoma did sufficiently state a cause of action for breach of the operating agreement in both actions.  See Shoma Coral Gables, LLC v. Gables Inv. Holdings, LLC, 307 So. 3d 153, 164 (Fla. 3d DCA 2020). While the appeal was pending the subject property was sold to Baptist Hospital for $37 million, leaving over $16 million in proceeds from that sale in escrow.

After the case was remanded by this Court, CMC and Colombo filed a motion to sever the trials of the direct and derivative actions, arguing they could not be tried together, and that Shoma could only try one case and

7

dismiss the other. At a hearing on the motion, Shoma proposed that the direct case be tried first as it felt it had asserted a direct claim for breach of the operating agreement against CMC and Colombo, and if the direct claim failed it should be allowed to pursue its derivative claim. The trial court agreed that the direct action should proceed to trial first but declined to determine the merits of the derivative claim going forward.

## IV. The Trial

In October 2021, the trial court held a five-day jury trial. Colombo, Shojaee and others testified as to the alleged breach of the operating agreement and resulting harm. Shoma presented testimony that it was seeking $10 million in reliance damages—representing the amount Shoma had paid into the project to construct and staff the sales office, market the project, design the condominium building prior to the shutdown—and argued it was entitled to recovery due to CMC's breach of the operating agreement. CMC and Colombo presented testimony and argued the sale of the property to Baptist rendered this litigation unnecessary, there was no breach of the operating agreement and that Shoma was not entitled to recover.

At closing, Shoma reasserted that it was solely seeking the return of the $10 million it individually invested into Luxury Holdings specifically earmarked for construction of the sales office and to develop and market the

8

project. While the jury deliberated, CMC and Colombo moved for a directed verdict arguing Shoma's claim was derivative and not direct and therefore should only proceed in the derivative action, citing to Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1035 (Del. 2004). CMC and Colombo also filed a written motion. The trial court did not rule on the motion but submitted the case for the jury's consideration, finding:

> But I think there is a uniqueness in this contract. And the way this contract is written, it gives – it says that, look we recognize that there are two people. But we want to make sure that with affiliated transactions certain decisions are being made by the unaffiliated member. It's your right. It's not the company's right. It's your right. And so now you're saying that, well, it's my right – if the law – if the right belongs to Shoma and but the harm is to the company. And I'm not sure that's true. I think that this is a direct harm to Shoma.

The jury then rendered a verdict for Shoma, finding both CMC and Colombo had breached the operating agreement. The jury awarded Shoma $10 million against CMC but zero damages against Colombo personally.

After the trial concluded, CMC and Colombo filed an omnibus post-trial motion for judgment, remittitur and new trial. Additionally, CMC and Colombo filed a memorandum in support of their motion for directed verdict. In January 2022, the trial court granted the motion for directed verdict finding that Shoma did not suffer a direct injury independent of an injury to Luxury Holdings because "[t]he exact same monetary consequence was suffered by

9

CMC and CMC experienced the same exact purported 'short-fall' when Shoma elected its contractual remedy to sell the LLC's Property to Baptist Hospital." The trial court thus vacated the jury's verdict and dismissed the case with prejudice. This appeal followed.

## STANDARD OF REVIEW [2]

"An order on a motion for directed verdict and for judgment notwithstanding the verdict is reviewed de novo." Kopel v. Kopel, 229 So. 3d 812, 819 (Fla. 2017). When reviewing the grant of a directed verdict, an appellate court "must view the evidence and all inferences of fact in the light most favorable to the nonmoving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party." Hernandez v. Mishali, 319 So. 3d 753, 757 (Fla. 3d DCA 2021) (quoting Banco Espirito Santo Int'l, Ltd. v. BDO Int'l, B.V., 979 So. 2d 1030, 1032 (Fla. 3d DCA 2008)).

## LEGAL ANALYSIS

Shoma argues the trial court erred in vacating the jury's verdict and damages award based on the conclusion that Shoma's claim was derivative.

---

[2] We note that pursuant to the terms of the operating agreement, Delaware law governs on substantive issues. Florida law, however, governs on procedural matters. See Siegel v. Novak, 920 So. 2d 89, 93 (Fla. 4th DCA 2006) ("[A] court will apply foreign law when it deals with the substance of the case and will apply the forum's law to matters of procedure.").

Shoma asserts this is a direct action because Shoma suffered the harm from the breach of its individual contractual rights under the operating agreement to jointly manage Luxury Holdings and make major decisions, such as significantly modifying the project's marking and sales, and the jury awarded reliance damages specifically to Shoma—not Luxury Holdings. CMC and Colombo argue the trial court did not err in granting the motion for directed verdict because Shoma's claim was derivative.

The operating agreement provides it is governed by Delaware law, thus Delaware substantive law applies in this case. See State-Wide Ins. Co. v. Flaks, 233 So. 2d 400, 402 (Fla. 3d DCA 1970) ("[T]he interpretation and obligations of a contract, as determined in the state in which the contract is made, are applicable and to be observed in the enforcement thereof in another state. . . .").

## I.    *Direct Versus Derivative Claims*

Under Delaware law, when determining whether a member's claim is derivative or direct courts utilize the test laid out in Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1035 (Del. 2004).  Under Tooley, the issue of whether a claim is derivative or direct turns solely on the following questions: (1) who suffered the alleged harm—the corporation or the suing member individually; and (2) who would receive the benefit of the recovery

or other remedy—the corporation or the suing member individually. [3]  See Tooley, 845 A.2d at 1035.  "[D]erivative actions are those that seek relief for injuries done to the corporation, while individual or class claims are those that seek to rectify harm inflicted directly upon the individual rights of stockholders."  In re Digex Inc. Shareholders Litig., 789 A.2d 1176, 1190 (Del. Ch. 2000).

Shoma asserts its claims are direct because it met the two Tooley requirements as CMC and Colombo breached a duty owed specifically to Shoma and Shoma received the benefit of the recovery because the jury awarded Shoma the undisputed amount of its reliance damages.  CMC and Colombo assert that under the Tooley test, Shoma raised a derivative claim because the damages all relate to lost profits.

*A. First Prong – Who Suffered the Harm?*

Under Tooley's first prong, the question "focuses on who suffered the alleged harm and, [for a direct claim,] requires that the stockholder

---

[3] Under Delaware law, a corporation member of a company may pursue a claim in a direct action.  See Stone & Paper Inv'rs, LLC v. Blanch, 2019 WL 2374005, at *4 (Del. Ch. May 31, 2019) (noting Stone & Paper Investors, LLC, a member and one-third owner of a corporation, had standing to pursue a breach of contract claim for breach of "a personal right belonging to the members"); NAF Holdings, LLC v. Li & Fung (Trading) Ltd., 118 A.3d 175, 181 (Del. 2015) (finding that NAF Holdings, LLC had the right "to press its breach of contract action directly" where breach of its own rights under the contract were at issue).

demonstrate that he or she has suffered an injury that is not dependent on an injury to the corporation." Brookfield Asset Mgmt., Inc. v. Rosson, 261 A.3d 1251, 1268 (Del. 2021). Shoma asserts the independent injury it suffered was CMC and Colombo's breach of its contractual rights under the operating agreement related to joint management over major decisions, such as unilaterally modifying the project's marketing and sales.

CMC and Colombo argue Shoma's claim fails to meet the Tooley standard because Shoma cannot demonstrate an injury that is not dependent on an injury to Luxury Holdings. CMC and Colombo rely on Brookfield, which holds that "dual-natured" claims are not permitted. 261 A.3d at 1274. A prohibited "dual-natured" claim is one where a claimant seeks a "double recovery" by raising direct and derivative claims "for [a] single injury." Id. at 1277. Essentially, this means a corporation and its shareholders may not recover damages from a defendant in both a direct and a derivative action for an identical injury. See In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 825–26 (Del. Ch. 2005), aff'd, 906 A.2d 766 (Del. 2006) ("[T]he court concludes that the injury alleged in the complaint is properly regarded as injury to the corporation, not to the class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. How then could the same

13

directors ever be liable to pay actual compensatory damages to both the corporation and the class for the same injury? The answer . . . is that they could not."). This, however, does not mean that a shareholder cannot maintain direct and derivative actions that arise from the same facts and circumstances. If the direct and derivative actions assert separate and distinct injuries, both may be maintained. See AHW Inv. P'ship v. Citigroup Inc., 980 F. Supp. 2d 510, 517 (S.D.N.Y. 2013) ("Even if Citigroup was also injured, plaintiffs' injuries are not depend[e]nt on Citigroup's injury merely because the same misconduct might have harmed Citigroup."); Grimes v. Donald, 673 A.2d 1207, 1212 (Del. 1996) ("Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim."), cited with approval by Tooley, 845 A.2d at 1038.

CMC and Colombo are correct that Shoma cannot pursue direct and derivative claims arising from an identical injury, but that is not the case here. In order to fall under the "dual-natured" track discussed in Brookfield, the injury suffered by the shareholder and the corporation must be identical. The mere fact than an injury is felt by all shareholders of the corporation is irrelevant. In fact, the Tooley court itself "expressly disapprove[d] . . . the concept that a claim is necessarily derivative if it affects all stockholders equally." Tooley, 845 A.2d at 1039. The court held that "a direct, individual

14

claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim." Id.

Here, while Shoma's separate actions arise from the same facts and circumstances, Shoma's direct claim seeks recovery based on CMC and Colombo's breach of Shoma's individual contractual rights under sections 4.3 and 4.8 of the operating agreement while its derivative claim seeks recovery based on breach of different contractual provisions relating to the duties owed to Luxury Holdings by CMC and Colombo. These are separate injuries. See Stone, 2019 WL 2374005, at *4 (declining to dismiss a complaint where plaintiff shareholders raised a direct claim for breach of one section of an operating agreement and a derivative claim for breach of another section of the operating agreement based on the same facts and circumstances). While it is true that in a general sense both Shoma and Luxury Holdings suffered harm when CMC and Colombo unilaterally shutdown the condominium project and the sales office, the harm for which Shoma seeks recovery is particularized: it arises from Shoma's reliance on CMC and Colombo's obligation to perform in compliance with the operating agreement.

Under the two relevant sections of the operating agreement, Shoma was given the right of joint management over decisions affecting the marketing for and ordinary business of Luxury Holdings and the right to determine if Luxury Holdings entered into or terminated an affiliate transaction. Under Tooley, "[i]f the contractual rights of the limited partners are 'independent' of the partnership's rights, then the claims will be considered direct." El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff, 152 A.3d 1248, 1262 (Del. 2016) (quoting Tooley, 845 A.2d at 1035)). Here, the plain language of the relevant sections makes it clear that the contractual rights given to Shoma were independent of Luxury Holdings' rights. Luxury Holdings did not have the right to jointly manage itself or make major decisions, such as those related to its own marketing and sales. Those contractual rights were bargained for and specifically belonged to Shoma.

Because the harm alleged—i.e., the loss of the $10 million Shoma paid to Luxury Holdings in reliance on CMC and Colombo's obligation to perform under the operating agreement—is inextricably linked to CMC and Colombo's improper shutdown of the sales offices and marketing efforts which resulted in Luxury Holdings being unable to conduct its ordinary business and the asserted breach of the operating agreement, the harm

16

alleged from the shutdown may be said to have been suffered by Shoma individually, not Luxury Holdings.

*B. Second Prong – To Whom Should the Relief Go?*

Under the second question of the Tooley test in determining whether a claim is direct or derivative, a court "should look to the nature of the wrong and to whom the relief should go." Tooley, 845 A.2d at 1039. Shoma asserts it was entitled to the relief because it sought reliance damages: namely, the approximately $10 million it paid to construct, develop, staff the sales office and market the project.

Delaware law provides that "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance." AB Stable VIII, LLC v. Maps Hotels & Resorts One, 2020 WL 7024929, at *101 (Del. Ct. Ch. 2020) (citation omitted). Further, shareholders are permitted to seek reliance damages in direct actions so long as they "alleged injuries resulting from their unique reliance that is 'independent of any alleged injury to'" the corporation. AHW Inv. P'ship, 980 F. Supp. 2d at 517 (quoting Tooley, 845 A.2d at 1035). We find Shoma established it was the injured party because CMC and Colombo breached its individual rights under the operating agreement, and it was

entitled to seek reliance damages in the amount of money it paid into the project.

In its order granting CMC and Colombo's motion for directed verdict the trial court found that Shoma's claim was derivative because "[t]he exact same monetary consequence was suffered by CMC and CMC experienced the same exact purported 'short-fall' when Shoma elected its contractual remedy to sell the LLC's Property to Baptist Hospital." This finding, however, mischaracterized the nature of the relief Shoma sought in this action. Here, Shoma only sought the return of the $10 million it paid to Luxury Holdings in reliance on CMC and Colombo's obligation to perform under the operating agreement. It was not seeking any "short-fall" or lost profits that occurred as a result of CMC and Colombo's actions. At trial, Shoma presented sufficient competent, substantial evidence that CMC and Colombo breached the operating agreement by shutting down the sales office and ending all marketing efforts—essentially terminating the project—and that Shoma relied on CMC and Colombo's obligation to comply with the terms of the operating agreement. Accordingly, Shoma met its burden under the second prong of Tooley by demonstrating that it, individually and directly, was wronged and harmed by CMC and Colombo's actions.

18

**CONCLUSION**

Viewing the evidence and all inferences of fact in a light most favorable to Shoma, as we are required to do, we find a proper view of the evidence could sustain a verdict for Shoma because it provided sufficient evidence that its claim was direct under the two-prong <u>Tooley</u> test and the reliance damages it suffered were independent of any injury suffered by Luxury Holdings.  We therefore reverse the directed verdict and remand to the trial court with directions to reinstate the jury's verdict, and for further proceedings.

Reversed and remanded with instructions.

**Shoma Coral Gables, LLC, etc. v.**
**Gables Inv. Holdings, LLC, etc., et al.**
Case No. 3D22-0206

GORDO, J., concurring.

I also write separately to discuss an interesting issue presented in this case.[4]  While Delaware law governs our decision on substantive issues, Florida law governs on procedural matters.  See Prestige Rent-A-Car, Inc. v. Advantage Car Rental & Sales, Inc. (ACRS), 656 So. 2d 541, 544 n.2 (Fla. 5th DCA 1995) ("[T]he law of the forum generally governs on procedural matters."); Quirch Foods LLC v. Broce, 314 So. 3d 327, 337–38 (Fla. 3d DCA 2020) ("Florida courts apply foreign law when dealing with the substantive issues in a case but apply the forum's law to procedural matters."); Aerovias Nacionales De Colombia, S.A. v. Tellez, 596 So. 2d 1193, 1195 (Fla. 3d DCA 1992) (concluding that "the law of the forum, i.e., Florida law, governs on procedural matters"); Siegel v. Novak, 920 So. 2d 89, 93 (Fla. 4th DCA 2006) ("[A] court will apply foreign law when it deals with the substance of the case and will apply the forum's law to matters of procedure.").

---

[4] Concurring in these circumstances may be unusual, but it is not unprecedented.  See Chavez v. Florida SP Warden, 742 F.3d 1267, 1273 (11th Cir. 2014) (Carnes, J.); United States v. Kopp, 778 F.3d 986, 989 (11th Cir. 2015) (Pryor, J.); Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J.); Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty., 57 F.4th 791, 817 (11th Cir. 2022) (Lagoa, J.).

Under Delaware's <u>Tooley</u> test, the trial court is required to engage in a highly fact specific inquiry to determine as a matter of law whether a claim is direct or derivative. Here, the trial court did so, and stated it thought the facts established the claim was direct and that Shoma had showed a harm that was separate and individual from harm to the corporation. It then allowed the case to be presented to the jury. The verdict form presented the jury with four questions:

> 1. Do you find by the greater weight of the evidence that Defendant, CMC, breached the Operating Agreement?
> 2. What is the amount of damages that **Shoma has suffered** on its claim for Breach of Contract against CMC?
> 3. Do you find by the greater weight of the evidence that Defendant, Ugo Colombo, breached the Operating Agreement?
> 4. What is the amount of damages that **Shoma has suffered** on its claim for Breach of Contract against Colombo?

(emphasis added).

After the jury agreed and found for Shoma, the trial court entered an order granting CMC's motion for directed verdict, now finding that "as a matter of law" the harm suffered by Shoma was the same as Luxury Holdings —only that of lost profits.

Because Florida law governs the procedural matters of this case, we apply the Florida standards of review here. This is important because the

21

post-verdict finding by the trial court that these claims were no longer direct "as a matter of law" specifically turned on a disagreement between the parties regarding competing factual disputes. The motion for directed verdict did not argue a lack of presentation of evidence at trial or a lack of competent, substantial evidence in Shoma's case. CMC simply reargued their version of the facts upon which the jury had now passed—namely, that Shoma had not shown an individual injury because its damages were lost profits. The record below, however, clearly establishes that Shoma was seeking reliance damages for CMC and Colombo's breach of the operating agreement. The trial court specifically instructed the jury on reliance damages and the jury's verdict outright awarded Shoma the exact amount of reliance damages Shoma sought. There was no presentation of evidence regarding any amount of potential lost profits or "short-fall."

In Florida, where cases are properly submitted to a jury for a determination of competing facts—judges do not—and cannot, act as the seventh juror and override that finding unless no proper view of the evidence could sustain the jury's verdict. See Premier Lab Supply, Inc. v. Chemplex Indus., Inc., 10 So. 3d 202, 205 (Fla. 4th DCA 2009) ("Under Florida law, a trial court can grant a directed verdict only when no proper view of the evidence could sustain a verdict in favor of the non-moving party. The court

22

must evaluate all facts in evidence and all reasonable inferences that can be drawn from those facts in the light most favorable to the non-movant.") (internal citation omitted); Aurbach v. Gallina, 721 So. 2d 756, 758 (Fla. 4th DCA 1998) ("[A] trial judge may not 'sit as a "seventh juror," thereby substituting his or her resolution of the factual issues for that of the jury.'" (quoting Poole v. Veterans Auto Sales and Leasing Co. Inc., 668 So.2d 189, 191 (Fla. 1996))).

While a trial court has the inherent authority to enter a directed verdict where the presentation of evidence was insufficient as a matter of law to establish the claims, it does not have the authority to sit as a seventh juror and determine factual issues. See Cox v. St. Josephs Hosp., 71 So. 3d 795, 801 (Fla. 2011) ("[W]hile a directed verdict is appropriate in cases where the plaintiff has failed to provide evidence that the negligent act more likely than not caused the injury, it is not appropriate in cases where there is conflicting evidence. . . ."); Sanders v. ERP Operating Ltd. P'ship, 157 So. 3d 273, 277 (Fla. 2015) ("Where the jury only has to draw one inference from direct evidence to reach a decision regarding the defendant's negligence, the jury is entitled 'to make the ultimate factual determination.'" (quoting Owens v. Publix Supermarkets, Inc., 802 So. 2d 315, 322 (Fla. 2001))); Friedrich v. Fetterman & Assocs., P.A., 137 So. 3d 362, 365 (Fla. 2013) ("When

determining whether a directed verdict is appropriate, the reviewing court may not reweigh the evidence or substitute its judgment concerning credibility of the witnesses for that of the trier of fact."); Edwards v. Orkin Exterminating Co., Inc., 718 So. 2d 881, 883 (Fla. 3d DCA 1998) ("Thus, despite the judge's disagreement with the jury's verdict, 'the trial judge does not sit as a seventh juror with veto power.'" (quoting Laskey v. Smith, 239 So. 2d 13, 14 (Fla. 1970))).

The fact that the jury passed on these competing facts—which the trial court considered had properly established direct claims—significantly governs the outcome in this case. Once the trial court deemed the facts sufficient for the direct claims to go before the jury, our directed verdict standard required that the trial court allow the verdict to stand unless the evidence was such that under no view could the jury's verdict be sustained. See Burch v. Strange, 126 So. 2d 898, 901 (Fla. 1st DCA 1961) ("The power to direct a verdict should be cautiously exercised, and a motion for a directed verdict should never be granted unless the evidence is such that under no view which the jury might lawfully take of the evidence favorable to the adverse party could a verdict for the latter party be sustained.").